David H. Krieger, Esq.
Nevada Bar No. 9086
HAINES & KRIEGER, LLC
8985 S. Eastern Ave., Suite 350
Henderson, NV 89123
Phone: (702) 880-5554
FAX: (702) 385-5518
Email: dkrieger@hainesandkrieger.com

Matthew I. Knepper, Esq.
Nevada Bar No. 12796
Miles N. Clark, Esq.
Nevada Bar No. 13848
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129
Phone: (702) 825-6060
FAX: (702) 447-8048
Email: matthew.knepper@knepperclark.com
Email: miles.clark@knepperclark.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| GRETTA MARSHALL, | : |
| | : |
| Plaintiff, | : Civil Action No.: 16-CV-2406-GMN-NJK |
| v. | : |
| | : **PLAINTIFF'S MOTION FOR PARTIAL** |
| THE CBE GROUP, INC., D/B/A CBE | : **SUMMARY JUDGMENT** |
| GROUP, | : |
| | : |
| Defendant. | : |

Plaintiff Gretta Marshall moves for partial summary judgment against Defendant The CBE Group, Inc. d/b/a CBE Group ("CBE") on her claims under the Telephone Consumer Protection Act ("TCPA"). Specifically, Plaintiff seeks judgment as a matter of law regarding (1) whether CBE initiated phone calls to her cellular phone number, (2) whether CBE's dialing apparatus constitutes an Automated Telephone Dialing System ("ATDS"), and (3) whether Ms. Marshall revoked her consent.[1] As the TCPA is a strict liability statute, the only remaining

---

[1] While revocation of consent is an affirmative defense under the Telephone Consumer Privacy Act ("TCPA"), the undisputed facts demonstrate that CBE cannot raise this defense.

question would be a calculation of her damages, and whether CBE's conduct was negligent or willful; Plaintiff seeks to reserve this question for a jury of her peers.

**INTRODUCTION**

To succeed in a lawsuit under the TCPA, a plaintiff must demonstrate that (a) the defendant called a cellular telephone number; (b) using an automatic telephone dialing system ("ATDS").[2] Authoritative regulatory guidance from the Federal Communications Commission ("FCC") has concluded that that the TCPA's broad language should prevent "circumvention" of its consumer protections, including its prohibition on the use of an ATDS.[3] Plaintiff's TCPA action hinges on a single question: can CBE circumvent the TCPA's prohibition on use of an ATDS by employing "clicker agents" who do nothing more than sit at a computer, point a mouse at an image of a bullseye, and click the icon all day long – without any knowledge of the consumer number associated with any "click," no ability to impact the actual dialing of the number in question, and no interaction with the consumer later?  If the answer is "no," then CBE undisputedly uses an ATDS and has violated Plaintiff's rights under the TCPA.  If the answer is "maybe," then the issue should go to trial.

The simplicity of the question belies a highly complex technical inquiry of CBE's dialing infrastructure – both its own, and that operated by third party LiveVox on its behalf. Plaintiff has retained Gary Snyder, an expert in the TCPA, who explains the relationship between the two entities.  Mr. Snyder points out a fairly unremarkable fact: that *all* systems, no matter how automated, *require* human intervention at some level in order to provide the information made subject to automation.  After carefully analyzing documentary evidence of CBE's "Manual Clicker Application" (MCA), the call records produced in this case, as well as the deposition testimony of both CBE and LiveVox witnesses, Mr. Snyder concludes that (1) the MCA does nothing more than load numbers into LiveVox's system for automatic dialing,

---

[2] *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017).  The second prong of the TCPA analysis can also be satisfied through use of an artificial or prerecorded voice, neither of which is in contention here.
[3] *See In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Red. 7961, 7973, 7975 (2015) ("2015 FCC Interpretation").

and (2) LiveVox's dialing platform is an ATDS, and (3) that platform then dials the loaded numbers.[4]  Because the loading of numbers is wholly distinct from the process of dialing those numbers, CBE's MCA does not constitute "human intervention" in the automated dialing process.[5]  In response, CBE has failed to disclose any expert at all, much less an expert report countering Mr. Snyder's detailed expert opinions.

Further, and while not Plaintiff's burden to prove this affirmative defense, CBE has no evidence whatsoever that Plaintiff provided her prior express written consent to call her cell phone at all (let alone) via CBE's ATDS; it is undisputed that CBE obtained her contact information via a "skip trace" and initial consent to be contacted could not possibly have occurred in these circumstances.  Even if Plaintiff had somehow provided her prior express consent, Plaintiff undisputedly revoked her consent to be called at a later time, which should have (but didn't) stop CBE's calls.  While Plaintiff need not even raise this as an affirmative defense, she raises it here to demonstrate that any such defense is disproven by a complete lack of evidence.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. DirecTV places an account with CBE for Collection; CBE obtains Ms. Marshall's Account via Skip tracing, and contacts her by phone even after she expresses her desire not to be contacted.

1.     On August 8, 2015, DirecTV placed a debt allegedly incurred by Plaintiff with CBE for collection.[6]  CBE began its collection efforts the next day, when it mailed Plaintiff a letter demanding payment of the debt.[7]  CBE also obtained Plaintiff's cell phone number from a

---

[4] *See* July 20, 2017 Supplemental Declaration of Randall A. Snyder ("Snyder Decl.") and attached exhibits, **Exhibit 1**; Sixth Supplement to Plaintiff's Initial Disclosures, July 20, 2017 ("Sixth Supplement"), **Exhibit 2**.  CBE filed Mr. Snyder's Supplemental Declaration, and all of its exhibits, into the public record on July 18, 2017.  *See* ECF Dkt. 32-4.  Plaintiff attaches that public filing here, modified only by making the redactions required under Local Rule IC 6-1.

[5] Snyder Decl., at ¶ 113.

[6] CBE's First Amended Answers to Plaintiff's First Set of Interrogatories, No. 10, May 4, 2017, **Exhibit 3**; Excerpts of Deposition of Terry Johnson as CBE's 30(b)(6) witness, May 4, 2017, at 66:21-67:10 ("CBE Depo"), **Exhibit 4**.  Plaintiff's account was first loaded onto CBE's system on August 8, 2015.  CBE Depo, at 103:1-16; CBE's Document Production, CBE0001-54, at CBE 0003 ("CBE Records"), **Exhibit 5**.

[7] CBE mailed three letters to Plaintiff seeking to collect the alleged debt to DirecTV: on August 9, 2015, November 7, 2015, and January 6, 2016.  CBE Records, at 0047-54; CBE Depo, 94:7-98:3.

skip-tracing vendor,[8] and made 189 outbound calls to both her cell phone number and her work number.[9]  CBE's 30(b)(6) witness admitted that CBE was intentionally calling Plaintiff's cell number.[10]

2.    Ms. Marshall could not confirm she ever owed DirecTV any money,[11] nor has CBE ever produced a contract expressly signed by both DirectTV and Plaintiff suggesting that Ms. Marshall ever gave her consent to be contacted by either DirecTV or CBE.[12]  Ms. Marshall first asked CBE to stop calling her in August 2015.[13]  On August 18, CBE received an inbound call from Ms. Marshall in which Plaintiff clearly expressed her desire not to receive further calls.[14]  Despite this communication, CBE continued calling Ms. Marshall; and on August 27, 2015, Plaintiff told CBE in response to one of its calls that it was going to block CBE's calls.[15]  Plaintiff paid additional money for a call-blocking service and used it to block CBE's number, and recalls seeing CBE Group's number appear on the application seemingly hundreds of times.[16]  However, even after Plaintiff placed CBE's name on her phone's block list, CBE continued to call her from different numbers, which she would subsequently block.[17]  On September 8, 2015, Plaintiff engaged in an expletive-filled conversation with CBE in which she

---

[8] CBE Depo, at 66:9-12; 102:11.  CBE also confirmed that the phone number it had for Ms. Marshall was a cell phone number.  *See id.* at 73:12-75:7; Phone Scrub Record.

[9] CBE Depo, at 190:13-192:13.  Ms. Marshall felt that CBE had called her "hundreds of times."  Excerpts of Deposition of Gretta Marshall, June 2, 2017, at 15:25-16:11  ("Marshall Depo"), **Exhibit 6**.  CBE would identify themselves on the call initially.  Marshall Depo, at 16:18-20.  Plaintiff recalls talking to representatives at CBE on six or seven occasions.  *Id.* at 25:14-25; 26:18-22.  She recalls answering an inbound call from CBE on approximately six occasions.  *Id.* at 28:7-11.

[10] Snyder Decl., at ¶ 69; CBE Depo, 73:12-13, 74:1-75:7.

[11] Marshall Depo, at 10:4-10.  Ms. Marshall could not recall if she had a DirecTV account, and if she had, it would have been in 2007 or 2008.  *See id.*  She could not recall receiving statements from DirecTV, or seeing a customer agreement from DirectTV.  *See id.*  Likewise, Ms. Marshall had never paid for someone else's DirecTV account.  *Id.* at 12:19-21.

[12] The only purported agreement they were able to produce was a generic contract which contained no evidence that Plaintiff signed.  CBE Records, at CBE 0098-109; CBE Depo, 71:18-72:19.

[13] Marshall Depo, at 23:16-23.  Ms. Marshall testified that she had told them to stop calling "back when they first began calling me."  *Id.* at 15:25-16:11.

[14] *See* CBE Depo, 142:22-144:8.  Overall, CBE's records indicate a total of 5 inbound calls associated with Plaintiff's account.  *Id.* at 190:13-192:13.

[15] *Id.* at 139:10-140:16.

[16] *See* Marshall Depo, at 18:17-22:14.

[17] *Id.* at 24:17-25:5.

stated she did not want any further calls on her account.[18]  Thereafter, on September 18, 2015, CBE began attempting to place calls to Plaintiff's workplace, and called her work 10 times between September 18 and 22, 2015.[19]

3.  CBE's policy was that if a consumer stated, "don't call," CBE would have marked the number accordingly and would not have called that number anymore.[20]  While a consumer would not have to use that precise phrase, the customer would have to use something "relatively close."[21]  CBE's 30(b)(6) witness acknowledged that Ms. Marshall's August 18 communication demonstrated that she no longer wanted to be contacted.[22]  CBE's employees testified that when a consumer specifically stated "do not call," they were trained to prevent the account from being called going forward, and would place a note in the account to prevent future calls.[23]  CBE's employees also testified that if a consumer made an inbound call and a collection agent told a consumer "Yep, I'll get the number removed for you," it would mean the number should be removed from the account (thus stopping the calls to the removed number).[24]

4.  Ms. Marshall testified that she had suffered damages in connection with CBE's actions.[25]  These included, but were not limited to, exacerbation of preexisting medical conditions, including migraine headaches; she incurred out-of-pocket copays at Quick Care

---

[18] CBE Depo, at 144:9-146:23.

[19] *Id.* at 147:2-19.

[20] *See id.* at 139:20-25.

[21] *Id.* at 140:17-24.  CBE's agents also claimed that "stop calling me" would indicate that collections on an account should be stopped.  *See* Excerpts of Deposition of Almir Husic, June 29, 2017, at 28:13-19 ("Husic Depo"), **Exhibit 7**.  Two CBE agents testified that "I'm going to block your number" would not result in noting that the customer's desire for calls to cease.  *See* Husic Depo, at 28:20-29:16; Excerpts of Deposition of Kristina Nikolic, June 14, 2017, at 25:15-26:21 ("Nikolic Depo"), **Exhibit 8**.  However, one CBE's agents testified that she believed she had some autonomy to interpret revocation statements and interpret what the consumer said, i.e., "[i]f someone uses an explicit statement that they do not want to be called anymore, I think that would be something that I would use to make my judgment."  Nikolic Depo, at 23:3-24:9.

[22] *See* CBE Depo, 142:22-144:8.  CBE's 30(b)(6) witness refused to acknowledge that either the August 27 or September 8 statements from Ms. Marshall also expressed her desire not to be contacted.  *See id.* at 139:10-140:16; 144:9-146:23.  Overall, CBE's records indicate a total of 5 inbound calls associated with Plaintiff's account.  *See id.* at 190:13-192:13.

[23] *See* Husic Depo, at 25:6-17; Excerpts of Deposition of Mark Scheel, June 14, 2017, at 48:21-15 ("Scheel Depo"), **Exhibit 9**.

[24] *See* Scheel Depo, at 46:22-48:13.

[25] Marshall Depo, at 46:23-47:49:7.

medical facilities in connection with these ailments.[26]

5.     On March 14, 2016, DirectTV "recalled" Plaintiff's account from CBE; CBE's witness could not explain why this had occurred.[27]

**B.   CBE and LiveVox Use an Autodialer.**

6.     CBE uses a system known as a "Manual Clicker Application" or "MCA"[28] to provide numbers for automatic dialing by a third party, LiveVox.[29]  The CBE MCA operates in conjunction with the LiveVox dialing system.[30]  According to the most recent MCA manual, the MCA requires a "dialing device" to generate a telephone call attempt, but fails to define what constitutes such a "dialing device," or the dialing software, dialing hardware, or dialing equipment.[31]  "[H]owever, it is apparent that such a function is used *in conjunction* with the MCA to perform the actual dialing process required to initiate outbound calls."[32]

### I.   The MCA Function is not Human Intervention.

7.     In the MCA portion of the system, a CBE "clicker agent" manually clicks a bullseye target on a computer screen,[33] with each click sending a telephone number to the

---

[26] *Id.* at 38:11-25; 53:15-54:3.

[27] CBE Depo, 103:24-104:20.

[28] Snyder Decl., at ¶¶ 48-49.

[29] *Id.* at ¶¶ 97-103; CBE Depo, at 37:3-21, 39:1-10, 40:8-10, 50:1-14.  Mr. Snyder characterizes the CBE MCA as doing nothing more than *provide* numbers for LiveVox to dial, but which does not participate in the dialing of those numbers itself – a factual reality which neither CBE's patent applications or deposition testimony can circumvent.  *See* Snyder Decl., at ¶¶ 97-103.

[30] *Id.* at ¶¶ 64, 70.  Mr. Snyder believes that Mr. Stark's description of the telephone number information passed from CBE's MCA to LiveVox as a "manual dial request" was misleading, and that CBE's "clicker agent" does nothing more than request that LiveVox dial the number itself.  *Id.* at ¶ 66.  CBE also used LiveVox to contact Plaintiff.  *See* CBE Depo, at 81:8-13.  LiveVox's 30(b)(6) representative characterizes the company as providing "a variety of cloud or SAAS telephony solutions related to contact center technology."  Deposition of Kevin Stark as LiveVox's 30(b)(6) witness, July 19, 2017, at 11:13-17 ("LiveVox Depo"), **Exhibit 10**. A copy of the "rough" transcript of this deposition was field into the public record by CBE on August 18, 2017.  *See* ECF Dkt. 32-4.  Plaintiff places the finalized transcript under seal.

[31] Snyder Decl., at ¶ 55.  CBE retains a copy of an "MCA Manual" which purportedly describes the MCA application.  *See* CBE Depo, at 20:9-20.  The MCA Manual is given to "[a]ny users of the [MCA]," including "clicker agents."  *See id.* at 33:1-5; 33:24-34:16.   The manual has been revised three times, with the most recent update occurring on April 18, 2014.  *Id.* at 22:13-23:1.

[32] Snyder Decl., at ¶ 55 (emphasis added).

[33] *Id.* at ¶ 53.  A non-administrative "clicker agent" can only perform three job functions: (1) selecting a group from a drop-down box; (2) clicking on the bullseye; and (3) logging out of the system.  *See* MCA Manual, as included in Snyder Declaration, Exhibit C, CBE 0109-122, at CBE 0116 ("MCA Manual"); *see also* CBE Depo, 37:3-40:19.

LiveVox system to be dialed by LiveVox.[34]  At the time the Bullseye is "clicked," no telephone number is presented to or viewed by the clicker agent; the agent is not otherwise aware that any authorized telephone number is purportedly being dialed when the bullseye is clicked.[35] "Clicker agents" do not actually interact with consumers.[36]  Nor do the CBE "collection agents" responsible for direct consumer contact perform the "clicker agent" function; CBE's employees testified that they did not initiate calls,[37] did not have any understanding of what the MCA Application was,[38] and did not even know anyone at CBE who was a "clicker agent."[39]

8.     Mr. Snyder characterizes the CBE MCA as doing nothing more than *providing* numbers for LiveVox to dial; however, CBE does not participate in the dialing of those numbers itself.[40]  The MCA is not a software-based phone application; nor can it perform any functions associated in dialing a call, such as "access signaling"; nor can calls be established either to or from the MCA.[41]  According to Mr. Snyder, since a "call" is "an *attempt* to communicate by telephone," the MCA cannot constitute such an "attempt."[42]  Instead, every time a "clicker agent" clicks a bullseye, a number is passed from CBE's MCA to the LiveVox system for automatic dialing,[43] in the same manner in which a user might actively load or import a list of telephone numbers into a progressive and predictive dialer.[44]  Thus, it is Mr. Snyder's opinion that the MCA does not constitute manual intervention in the dialing process, but merely loads

---

[34] Snyder Decl., at ¶¶ 66-68.

[35] *See id.* at ¶ 58.

[36] According to CBE's 30(b)(6) witness, more than 90 percent of the time a "clicker agent" would not be the agent who answered the "clicked" number.  CBE Depo, 41:19-44:3.  According to the Manual, "clicker agents" are based in the Philippines, and connected through a cloud based interface.  MCA Manual, at CBE 113.  Between mid-2015 through 2016, CBE employed between 15 and 30 "clicker agents."  CBE Depo, 34:3-16.

[37] Each of the three agents testified in slightly different words.  Mr. Husic testified that collection agents pressed a "ready" button and a call was transferred to them.  *See* Husic Depo, at 32:9-35:3.  Ms. Nikolic testified that calls were not directly dialed.  *See* Nikolic Depo, at 22:18-23:2.  Mr. Scheel testified that phone calls were not made, but were received.  *See* Scheel Depo, at 28:5-22.

[38] *See* Husic Depo, at 18:2-7; Nikolic Depo, at 12:2-12; Scheel Depo, at 33:9-14.

[39] *See* Husic Depo, at 15:9-17:13; Nikolic Depo, 12:13-20; Scheel Depo, at 33:15-17.

[40] Snyder Decl., at ¶¶ 97-103; CBE Depo, at 37:3-21, 39:1-10, 40:8-10, 50:1-14.

[41] Snyder Decl., at ¶ 100.  According to Mr. Snyder, "access signaling" is a term used to define traditional means of dialing a number, such as calls initiated from an individual through a rotary telephone.  *See id.* at ¶ 14.

[42] *Id.* at ¶¶ 101-02.

[43] *Id.* at ¶ 102.

[44] *Id.* at ¶ 105.

- 7 -

numbers into LiveVox's dialing system to be automatically dialed.[45]   As such, there is no "human intervention" in the dialing system by virtue of CBE's use of the MCA.[46]   Thus the MCA cannot be used to demonstrate that CBE's dialing system is not an ATDS.   Bereft of this evidence, the dialing system is an ATDS.[47]

## II. The LiveVox Function is an ATDS.

9.     LiveVox uses a centralized "cloud-based" computer equipment system to sell various telephone dialing and call center services.[48]   LiveVox manages and operates the centralized hosted computerized software and equipment that provides automatic telephone dialing services to CBE via the internet.[49]

10.     LiveVox provides its customers, including CBE, with predictive and progressive ATDS dialing functions.[50]   CBE has a contract with LiveVox in which LiveVox outlines the use of its technology.[51]   There, LiveVox defines its "Application Service" as a "hosted, cloud-based *dialing* solution," which includes an "Automated Call Distributor ("ACD")" and a "Predictive Dialer."[52]   LiveVox supports the recording and reporting of both "connected" and "not connected" call dispositions.[53]   Control over these calling functions permits LiveVox to perform "call progress analysis," a functional process to analyze call progress tones and messages established at the time of electronically signaling out the specific digits of a telephone number.[54]   Mr. Snyder explains that if CBE, and not LiveVox, initiated the call in question, LiveVox would not be able to perform "call progress analysis."[55]

11.     The events taking place at LiveVox once a "manual dial request" is made from a

---

[45] *Id.* at ¶ 104.
[46] *See, e.g., id.* ¶¶ 9-13.
[47] *See id.* at ¶¶ 113-131.
[48] *Id.* at ¶¶ 70-71.
[49] *See id.* at ¶ 71.
[50] *Id.* at ¶ 72.
[51] *See* Excerpts of LiveVox Master Subscription Agreement, as included in Snyder Declaration, Exhibit I, CBE 0142-143 ("Agreement"); *see* CBE Depo, 193:4-15 (alluding to the existence of a contract).
[52] Agreement, at 142.
[53] Snyder Decl., at ¶ 73.
[54] *Id.* at ¶¶ 77-78; LiveVox Depo, at 50:7; 54:22-55:4.
[55] Snyder Decl., at ¶ 79.

CBE "clicker agent" also show that LiveVox is utilizing an ATDS to actually make the calls. Specifically, after a request to dial a number[56] is sent from the CBE MCA,[57] it is (1) captured by LiveVox's "ACD" application,[58] (2) passes through several compliance checks,[59] (3) is passed to a media server,[60] (4) enters a SIP gateway,[61] and (4) is directed to basic networking equipment,[62] before finally (5) leaving the LiveVox system and being captured by carriers and enters the public switch network.[63]   CBE's internal documents contained a list of calls, which indicated that a call was "dialed by LiveVox."[64]

12.    LiveVox's ACD application both controls the dialing of outbound calls and is primarily responsible for tracking CBE "call agent" availability to receive these calls.[65]   The ACD also initiates outbound VoIP calls on behalf of CBE using a Session Initiation Protocol ("SIP").[66]   Critically, LiveVox's SIP process messages are not transmitted back to CBE's MCA; indeed, CBE's MCA has no telephone functions and cannot be connected to a call or be a party to a call.[67]   Instead, when LiveVox's automatic outbound call is answered by a live person,[68]

---

[56] LiveVox admitted that the information CBE sends includes "the phone number to be dialed." LiveVox Depo, at 44:10-19.

[57] CBE sends LiveVox a "manual dial request," causing LiveVox to run several checks, and then determine whether a CBE agent is available to take a call. *Id.* at 31:18-32:25. LiveVox testified that "to successfully . . . take a request for a manual dial from CBE and send it out to the public switch telephone network, we have to successfully initiate a call." *Id.* at 39:6-17.

[58] *Id.* at 48:2-49:7. "ACD is an industry term and describes an automatic function that connects calls to be transferred inbound to available collection agents. This is a core function required for automatic outbound dialed calls that are to be connected between a consumer and a call center agent for predictive and progressive automatic dialing." Snyder Decl., at ¶ 81.

[59] The ACD then passes the request to a "manual queuer," i.e., an application on LiveVox hardware, which runs several compliance checks. LiveVox Depo, at 49:8-17; 50:6-15.

[60] *Id.*, at 49:8-17. The media server is a software application residing on hardware that is responsible for initiating the SIP signaling out to LiveVox's networking equipment. *Id.* at 19-50:1.

[61] *See* Snyder Decl., at ¶ 80.

[62] The networking equipment is comprised of "commercial routers, switches, Ethernet cables, those types of devices." LiveVox Depo, at 51:18-22; *see also id.* at 51:24-54:7 (describing the flow of data through LiveVox's networking equipment, for which the router serves as the exit point).

[63] *See* Snyder Decl., ¶ 80; LiveVox Depo, at 54:22-55:4. This system would have been used in Plaintiff's case. *Id.* at 60:2-4.

[64] CBE Depo, at 169:19-22.

[65] Snyder Decl., at ¶ 83. LiveVox is able to check for CBE agent availability because each CBE agent is logged into one of LiveVox's systems. LiveVox Depo, at 33:6-14.

[66] Snyder Decl., at ¶ 84. A SIP can be used in conjunction with VoIP, i.e., internet telephony, to complete the process of dialing a number automatically. *See* Snyder Decl., at ¶¶ 17-27.

[67] Snyder Decl., at ¶ 85; LiveVox Depo, at 58:15-59:13 (noting that before a call is answered, as part of LiveVox's SIP Protocol, SIP messages or SIP signals are sent between the media server and the carriers).

LiveVox's ACD function connects the call to an available CBE collection agent – *not* the "clicker agent."[69]   LiveVox selects the CBE agent who will receive a completed call.[70]   Mr. Snyder explains that "this is precisely how automated predictive dialing and progressive dialing functions operate, the only difference being the particular algorithm used to control the rate at which automatic outbound calls are initially dialed."[71]   Because LiveVox's system has control of the dialing of the call, Mr. Snyder concludes that the LiveVox automatic dialing system initiated 189 outbound calls between August 10, 2015 and February 11, 2016.[72]

13.     Evidence on the face of call log records produced in this case also demonstrate that it is LiveVox who initiates the call.[73]   Specifically, the records show that the "Dialer," "CallType," and "Call_Result" fields are automatically recorded and stored by the LiveVox dialing system.[74]   CBE also acknowledged that LiveVox would create both a "transaction ID" and "session ID."[75]   LiveVox also provided a list of "outcomes" for the call, such as "no answer" and "hung up in opening."[76]   The "start time" on the calls is a timestamp created by LiveVox, which demonstrates that LiveVox, and not CBE, is initiating the automatically dialed call.[77]   Further, "The call progress analysis function must be performed by an automatic dialing system

---

[68] LiveVox's media server will inform LiveVox whether a call has been answered by a consumer or not. LiveVox Depo, at 55:9-12.  This requires the media server to perform audio analysis to determine whether the speaker was an answering machine or a live person.  *Id.* at 55:13-25; 56:5-21.

[69] *Id.* at 27:25-29:11; 60:14-62-25; *see* Snyder Decl., at ¶ 86.  If a consumer picks up the phone, the carrier will sent a responsive signal through the carrier and to the media server. LiveVox Depo, at 60:5-13.  The media server continues to keeps both "legs" of the call open and bridged during the interaction between consumer and CBE agent. *See id.* at 63:64:2.  If the consumer terminates the call, the media server is notified of that fact by the carrier through a SIP signal, and sends a notification to the ACD that the call has ended.  *Id.* at 64:11-65:3.  Conversely, if a CBE agent terminated the call, the media server would receive a notification from the ACD, and then notify the carrier of the termination via SIP signaling. *Id.* at 65:4-15.

[70] CBE Depo, at 179:3-19.

[71] Snyder Decl., at ¶ 86.

[72] *Id.* at ¶¶ 88-89; Gretta Marshall Call Detail Records, LiveVox Outbound Calls (8/10/15 – 2/11/16), as included in Snyder Declaration, Exhibit H ("LiveVox Calls").

[73] Under the CBE/LiveVox Agreement, "Usage" is used as a billing mechanism, which is triggered by "Connection Time."  Agreement, at 142.  "Connection Time" begins "when LiveVox received notice that a call has connected to a called party, or a call has connected from a calling party to the consumer, to the time when LiveVox received notice that the connection has ended." *Id.*

[74] Snyder Decl., at ¶ 91.

[75] CBE Depo, 185:1-11; 185:18-186:5.

[76] LiveVox Depo, at 66:8-67:5.

[77] Snyder Decl., at ¶¶ 92-93; LiveVox Depo, at 25:12-23.  CBE's witness acknowledged that the time for each call was tracked by LiveVox.  CBE Depo, at 173:17-25.  The "end" time is also contributed by LiveVox.  LiveVox Depo, at 29.:16-30:2; 36:20-25.

in order to automatically record all aspects of initiated outbound calls and inbound calls;" LiveVox's system performs this function.[78]

14.    Thus, Mr. Snyder concludes that "the LiveVox system is equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list of database of numbers, and to dial such numbers *without human intervention*."[79]   Thus LiveVox's system was actually used to initiate automatic cell phone calls to the Plaintiff in this case.[80]

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[81]   Material facts are those that may affect the outcome of the case.[82]   A dispute as to a material fact is genuine if there's sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.[83]   "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor."[84]   Summary judgment assists in part "to isolate and dispose of factually unsupported claims."[85]

In determining whether to grant or deny summary judgment, courts apply a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."[86]   In

---

[78] Snyder Decl., at ¶ 95.
[79] *Id.* at ¶ 96.
[80] *Id.*
[81] Fed. R. Civ. P. 56(a).
[82] *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).
[83] *Id.*
[84] *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).
[85] *Celotex v. Catrett*, 477 U.S. 317, 323–24 (1986).
[86] *C.A.R. Transp. Brokerage v. Darden Resorts*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.[87]  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.[88]

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists.[89] To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[90] In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data.[91] Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial.[92]

On summary judgment, a court's function is not to weigh evidence and determine the truth but to determine whether a genuine issue for trial exists.[93]  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor."[94]  However, summary judgment may be granted if nonmoving party's evidence is merely colorable or is not significantly probative.[95]

//

//

---

[87] *See Celotex*, 477 U.S. at 323–24.
[88] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).
[89] *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).
[90] *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).
[91] *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).
[92] *See Celotex*, 477 U.S. at 324.
[93] *See Anderson*, 477 U.S. at 249.
[94] *Id.* at 255.
[95] *See id.* at 249–50.

**DISCUSSION**

Congress enacted the TCPA amid outrage from consumers "over the proliferation of intrusive, nuisance [telemarketing] calls to their homes."[96] "Congress determined that federal legislation was needed because telemarketers, by operating interstate, were escaping state-law prohibitions on intrusive nuisance calls," and "bans certain practices invasive of privacy."[97]

This congressional policy is codified at 47 U.S.C. § 227. Section § 227(b) provides that it is unlawful for any person "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any [ATDS] or an artificial prerecorded voice—(iii) to any telephone number assigned to a . . . cellular telephone service. . . ."[98] An ATDS is "equipment that has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[99] The FCC is authorized to "prescribe regulations to implement the requirements" of the TCPA.[100] When the TCPA does not define a term, courts rely on the FCC's regulations to "interpret and clarify" the term in question.[101]

Both courts of appeals and trial courts have held that the TCPA "is essentially a strict liability statute,"[102] and "there is no statutory requirement that a recipient be charged for an incoming call on a cellular line in order for a violation to occur."[103] Section 227(b)(3) permits a private right of action for either violations of the TCPA itself, or the FCC's regulations, in

---

[96] *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

[97] *Id.* at 371.

[98] 47 U.S.C. § 227(b)(1)(A)(iii).  An exception exists for calls made "solely to collect a debt owed to or guaranteed by the United States," which is not applicable here. *See id.*

[99] *Id.* at § 227(a)(1).

[100] *Id.* at § 227(b)(2).

[101] *Van Patten*, 847 F.3d at 1044; *Middleton v. Human Behavior Institute, Ltd.*, No. 16-cv-1214-GMN-NJK, 2017 WL 579896, at *2 (D. Nev. Feb. 13, 2017); *see also Olney v. Job.com, Inc.*, No. 1:12–cv–01724–LJO, 2014 WL 1747674, at *4 (E.D. Cal. May 1, 2014) ("The FCC's interpretations of TCPA are controlling unless invalidated by a court of appeals.").

[102] *Alea London Ltd. v. American Home Services, Inc.*, 638 F.3d 768, 776 (11th Cir. 2011); *see Universal Underwriters Ins. Co. v. Lou Fusz Automotive Network, Inc.*, 401 F.3d 876, 882 (8th Cir. 2005) ("intent is not a prerequisite to liability under the Act."); *CE Design Ltd. v. Prism Bus. Media, Inc.*, No. 07 C 5838, 2009 WL 2496568, at *3 (N.D. Ill. Aug. 12, 2009) ("The TCPA is a strict liability statute. . . .").

[103] *Inguez v. The CBE Group*, 969 F. Supp. 2d. 1241, 1247 (E.D. Cal. 2013); *Toth v. Stephens and Michaels Associates, Inc.*, No. 13-cv-372-GMN-VCF, 2014 WL 5687418, at *4 (D. Nev. Nov. 4, 2014) (citing *Inguez*). *Cf. Toldi v. Hyundai Capital America*, No. 16-cv-1877-APG-GWF, 2017 WL 736882, at *2 (D. Nev. Feb. 23, 2017) (finding that in passing the TCPA "Congress meant to combat a substantive harm, not just a procedural one," and for purposes of Article III standing, that "the TCPA is different from statutes that can be violated without harming a consumer. . . .").

which a plaintiff may recover "actual monetary loss from such violation, or to receive $500 in damages for each such violation, whichever is greater."[104]   If the Court finds that the defendant's violation of the statute or regulations was willful, it may award treble damages to the injured plaintiff.[105]

A plaintiff makes out a prima facie case under the TCPA by showing (a) the defendant called a cellular telephone number, (b) using an automatic telephone dialing system.[106]   While the TPCA permits calls made for emergency purposes or with the prior express consent of the party, "[e]xpress consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof."[107]   Here, the undisputed facts show that (1) CBE called the plaintiff;[108] and (2) CBE used an ATDS in placing each of the 189 calls at issue.[109]   Further, CBE has no evidence to suggest that the calls were made for emergency purposes, or that Plaintiff ever provided her consent; even if she did, she explicitly revoked that consent later.[110]   The only question for the jury will be whether CBE's conduct is negligent or willful.

## A.   CBE called the Plaintiff for non-emergency purposes.

It is undisputed that CBE called the Plaintiff's cell phone number 189 times.[111]   It also undisputed that the calls were not made for emergency purposes.[112]   CBE's 30(b)(6) witness admitted that CBE was intentionally calling Plaintiff's cell number.[113]

//

//

//

---

[104] 47 U.S.C. § 227(b)(3)(A)-(B); *see Harris v. American General Financial Services, LLC*, No. 10-cv-01662-GMN-VCF, 2012 WL 2243663, at *2 (D. Nev. June 14, 2012)
    Federal courts have federal-question jurisdiction over private TCPA suits. *Mims v. Arrow Financial Services*, 565 U.S. 368, 376 (2012).
[105] 47 U.S.C. § 227(b)(3)(C).
[106] *See Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (2012); *Van Patten*, 847 F.3d at 1044; *Toth*, 2014 WL 5687418, at *4.
[107] *Van Patten*, 847 F.3d at 1044.
[108] Statement of Undisputed Material Facts, at ¶¶ 1-3 ("SUMF")
[109] *E.g.*, *id.* at ¶¶ 6-14.
[110] *Id.* at ¶¶ 1-4.
[111] *Id.* at ¶¶ 1-3.
[112] *Id.* at ¶ 1.
[113] Snyder Decl., at ¶ 69; CBE Depo, 73:12-13, 74:1-75:7.

**B.  CBE used an ATDS to call Plaintiff.**

    **1.  The FCC's authoritative guidance interpreting the TCPA does so broadly with respect to its definition of an ATDS, and cautions that callers may not construct systems to "circumvent" the statute's broad reach.**

The TCPA defines an ATDS as "equipment which has the *capacity* (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers. . . ."[114]  "[T]he statute's clear language mandates that the focus must be on whether the equipment has the *capacity* 'to store or produce telephone numbers to be called, using a random or sequential number generator.'"[115]  In July 2015, the FCC issued new interpretative rules regarding the TCPA.[116]  Therein the FCC noted that "Congress intended a broad definition of autodialer,"[117] and that "the TCPA's unqualified use of the term 'capacity' was intended to prevent circumvention of the restriction on making autodialed calls to wireless phones. . . ."[118]  The FCC also found that "parties cannot circumvent the TCPA by dividing ownership of dialing equipment."[119]  Instead, "such equipment can be deemed an autodialer if the net result of such voluntary combination enables the equipment to have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers."[120]

In its 2015 Interpretation, the FCC reaffirmed that "dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of 'autodialer') even if it is not presently used for that purpose."[121]  In other words, to have the "capacity" to be an autodialer, a system "is not limited to its current configuration but also includes its potential functionalities."[122]  Further, "[a] piece of equipment can possess the requisite 'capacity' to satisfy the statutory definition of an 'autodialer' even if,

---

[114] 47 U.S.C. § 227(a)(1).

[115] *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. Cal. 2009) ("[A] system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it.") (internal quotations omitted).

[116] *See* 2015 FCC Interpretation.

[117] *See id.* at 7974.

[118] *Id.* at 7973 (citations omitted).

[119] *Id.* at 7977.

[120] *Id.* at 7978.

[121] *See In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Red. 7961, 7974 (2015) ("2015 FCC Interpretation").  *See also Pozo v. Stellar Recovery Collection Agency, Inc.*, No. 15-cv-929-T-AEP, 2016 WL 7851415, at *5 (M.D. Fla. Sept. 2, 2016) (discussing 2015 FCC Interpretation).

[122] 2015 FCC Interpretation, at 7974.

for example, it requires the addition of software to actually perform the functions described in the definition."[123]

Based on the broadly worded Congressional enactment, the FCC concluded that the term "autodialer" encompassed "predictive" dialing systems, i.e., "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls."[124]  The FCC noted that

> the basic functions of an autodialer are to dial numbers without human intervention, and to dial thousands of numbers in a short period of time.  How the human intervention element applies to a particular piece of equipment *is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination.*[125]

Critically, the FCC rejected a "human intervention" test, as a "simple variation on the 'present ability' arguments" it also rejected.[126]  In Mr. Snyder's experience, there is no objective means to determine if computerized dialing equipment systems are "compliant" with the TCPA.[127]

Mr. Snyder's expert testimony distinguishes between four types of ATDS dialing systems: "preview," "progressive," "predictive," and "unattended message."[128]  The presence of an ATDS depends in large part on data ascertained through evaluation of call detail records (CDRs), or "call logs."[129]  In Mr. Snyder's opinion, "CBE utilized equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list of database of numbers, and to dial such numbers without human intervention."[130]  In short, CBE's system is an ATDS, and CBE used this system to call the Plaintiff.

As Mr. Snyder's expert testimony shows, CBE's dialing systems rely on the LiveVox dialing system to make calls, and that CBE's use of "clicker agents" must be viewed as a single

---

[123] *Id.* at 7975.
[124] *Id.* at 7973-74  (citing *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 F.C.C. Rcd. 14014, 14091 (2003) ("2003 FCC Interpretation")).
[125] 2015 FCC Interpretation, at 7975 (internal quotations and quotation marks omitted.
[126] *Id.* at 7976.
[127] Snyder Decl., at ¶ 50.
[128] *Id.* at ¶¶ 28-37.
[129] *Id.* at ¶¶ 43-44.
[130] *Id.* at ¶ 13.

component in the integrated system for placing calls,[131] and the role of the "clicker agents" is best viewed as manually uploading the calls for LiveVox to automatically dial.[132]  In short, the integrated system involves use of an ATDS, which CBE cannot circumvent by dividing ownership of the equipment in question.

### 2.  Plaintiff has retained an expert who opines that CBE's MCA application is an ATDS, and CBE has disclosed no expert to refute this testimony.

Mr. Snyder supports his opinions both through a declaration signed under penalty of perjury; he has also been deposed in this case.[133]  Mr. Snyder has over 30 years of experience in telecommunications work and system architecture, engineering, design and technology; has expertise in the fields of both wireline and wireless telecommunications networking technology; and has been retained as a testifying or consulting expert in over 160 cases regarding cellular telecommunications technology, including 117 cases by both plaintiffs and defendants regarding the TCPA and associated regulations.[134]  Mr. Snyder has taught many classes and seminars on telecommunication network technologies, and is the co-author of several books on telecommunications.[135]  In formulating his opinions, Mr. Snyder relied on numerous sources from this litigation, as well as leading secondary sources.[136]

Under Federal Rule of Evidence 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the produce of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."[137]  "An expert may base an opinion on facts or data in the case that the expert has been made aware of or

---

[131] SUMF, at ¶¶ 6-14.

[132] *Id.* at ¶ 8.

[133] *See generally* Snyder Decl.; Expert Deposition of Randall A. Snyder, June 8, 2017, ECF Dkt. 31-6.  Mr. Snyder previously submitted an expert declaration on May 19, 2017, but reserved the right to supplement his opinions based on new facts as they became available; in light of new evidence, Mr. Snyder "strongly reaffirm[ed] his prior opinion that CBE uses an ATDS.  *See* Snyder Decl., at ¶¶ 8, 13.

[134] Snyder Decl., at ¶ 3.  *See also* Randall A. Snyder, Curriculum Vitae, as included in Snyder Declaration, Exhibit A, ("Snyder CV").

[135] Snyder Decl., at ¶¶ 4-5.

[136] Snyder Decl., at ¶ 7.

[137] *Id.*

personally observed," and the evidence relied on need not be admissible "if experts in the particular field would reasonably rely on those facts or data in forming an opinion on the subject."[138] Moreover, "[a]n opinion is not objectionable just because it embraces an ultimate issue."[139] As the Ninth Circuit stated in *Bulthius v. Rexall Corp.*, "Expert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in [an] affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not."[140] "As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case."[141]

Mr. Snyder's background clearly qualifies him as an expert in this case; his expert opinions are premised on a review of CBE and LiveVox's documents, as well as the deposition testimony offered by CBE and LiveVox.[142] Indeed, Mr. Snyder's opinions regarding the structure of CBE and LiveVox's integrated automated calling system are not refuted by any expert testimony – because CBE has not even disclosed an expert in this case.[143] Thus, the Court can look to Mr. Snyder's expert opinion as providing a definitive, and unrefuted, analysis of CBE and LiveVox's integrated system for placement of automated calls.

## C. Plaintiff never provided her consent to CBE, and even if she did, she revoked it.

"Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendants bears the burden of proof."[144] "The Ninth Circuit has defined "express consent" to mean consent that is "clearly and unmistakably stated,"[145] however "the

---

[138] Fed. R. Evid. 703.

[139] *Id.* at 704.

[140] 789 F.2d 1315, 1318 (9th Cir. 1985); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1435-36 (9th Cir. 1995).

[141] *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th Cir. 1997); *see also Mey v. Venture Data, LLC*, --- F. Supp. 3d ----, No. 14-cv-123 (Bailey), 2017 WL 1193072, at *15 (N.D.W.Va. Mar. 29, 2017) (finding that a reasonable jury could rely on expert testimony that concluded that defendant had used an ATDS).

[142] Snyder Decl., at ¶ 7.

[143] *See* Sixth Supplement.

[144] *Van Patten*, 847 F.3d at 1044; *See Grant v. Capital Management Services, L.P.,* 2011 WL 3874877, at *1, n.1. (9th Cir. Sept. 2, 2011); *Toth v. Stephens & Michaels Assocs., Inc.*, No. 2:13-CV-00372-GMN, 2014 WL 5687418, at *4 (D. Nev. Nov. 4, 2014).

[145] *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009).

consent must be considered to relate to the type of transaction that evoked it."[146]   The 2015 FCC Interpretation states that a consumer "may revoke consent by any reasonable means that clearly expresses her desire not to receive further calls."[147]   The FCC's 2015 Interpretation notes that the TCPA does not speak directly to the issue of revocation, but "in light of the TCPA's purpose, any silence in the statute as to the right of revocation should be construed in favor of consumers."[148]   To that end, the FCC concluded that callers cannot dictate the specific form of revocation or "deliberately design systems or operations in ways that make it difficult or impossible to effectuate revocations."[149]   Instead, consumers could revoke either orally or in writing, so long as the revocation "clearly expresses a desire not to receive further messages," a determination of which depended on whether (1) a consumer had a reasonable expectation that revocation could be effectuated, and (2) whether the caller could have "implemented mechanisms to effectuate a requested revocation without incurring undue burdens."[150]   The FCC also placed "the burden on the caller to prove it obtained the necessary prior express consent if any question of consent is in dispute."[151]

Even if Plaintiff carried the burden to prove express consent, which she does not, the undisputed facts show no evidence she ever gave it.   CBE never produced a contract executed between DirecTV and Plaintiff, and CBE acquired Plaintiff's cell phone via skiptrace.[152]   Mr. Snyder's also opines about skiptracing, which he characterizes as "a method for locating individuals for the purpose of contacting them," which "is performed via data analysis of personal information obtained from various and multiple public and private databases."[153]   Skiptracing is used "when the debtor address and telephone number information stored in the

---

[146] *Van Patten*, 847 F.3d at 1045-46 (finding that giving a phone number alone does not amount to consent to receive calls or text messages at that number irrespective of purpose, as "FCC orders and rulings show that the transactional context matters in determining the scope of a consumer's consent to contract.").

[147] 2015 FCC Interpretation, at 7998-99.   In so doing, the FCC drew upon "the well-established common-law right to revoke prior consent," and rejected First Amendment challenges because "individuals are not required to welcome unwanted speech into their homes and that the government may protect this freedom."  *Id.* at 7993-94.   Later, the FCC clarified that "nothing . . . prohibits carriers or VoIP providers from implementing call-blocking technology that can help consumers who choose to use such technology to stop unwanted robocalls."  *Id.* at 8033.

[148] *Id.* 7993 (citing *Gager v. Dell Financial Services*, 727 F.3d 265, 270 (3d Cir. 2013)).

[149] *Id.* at 7996 & n.233.

[150] *Id.* at 7996.

[151] *Id.* at 7994.

[152] Snyder Decl., at ¶ 40; CBE Depo, 61:8-20, 64:3-10, 66:9-12.

[153] *Id.* at ¶ 38.

account records are incorrect or non-existent."[154]  This means that "when cellular telephone numbers are obtained by debt collectors via skiptracing, they may be characterized as 'unauthorized' . . . and it may be impermissible to call them."[155]

Even if CBE could somehow demonstrate that it had Ms. Marshall's consent to contact her initially, she undisputedly revoked that consent later.  Consumers "have a right to revoke consent, using any reasonable method including orally or in writing," and "The FCC emphasized that the TCPA does not permit the calling party to designate the exclusive means of revocation, and instead, the called party must "clearly express his or her desire not to receive further calls."[156] Plaintiff revoked her consent on three occasions: on August 18, August 27, and September 8, 2015.[157]  While CBE contested whether the latter two expressions of revocation were sufficiently clear, it did not contest her August 18 entry.[158]  Thus, at an irreducible minimum, all calls made after August 18, 2015 – including the calls it placed to her work – were made without the Plaintiff's consent.[159]

**D.  Plaintiff suffered damages.**

While Plaintiff is not moving the Court for summary judgment regarding her damages, she notes that "[t]he TCPA is essentially a strict liability statute . . . ."[160]  A mistaken belief that the calls were made with prior express consent is no defense to liability.[161]  In this case, there was no mistake, and CBE's violation of the TCPA was intentional: its call logs show that it dialed Plaintiff's number 189 times, including on numerous occasions after she unequivocally expressed her desire that all calls cease.[162]  Plaintiff also testified that she suffered out-of-pocket expenses in the form of, *inter alia*, copays at Quick Care, as well as exacerbation of her medical

---

[154] *Id.*

[155] *Id.* at ¶ 39.

[156] *Van Patten*, 847 F.3d at 1047 (quoting 2015 FCC Order, 30 F.C.C. Rcd. 7961, 7996, 7997 (2015)).

[157] *See* SUMF, at ¶¶ 2-3.

[158] *See* SUMF, at ¶¶ 2-3.

[159] *See id.*

[160] *Alea London Ltd. v. Am. Home Servs.*, 638 F.3d 768, 776 (11th Cir. Ga. 2011); *see also* "The TCPA provides for statutory damages of $500 for each negligent violation . . ." *Malta v. Fed. Home Loan Mortg. Corp.*, 2013 U.S. Dist. LEXIS 15731, 18 (S.D. Cal. Feb. 4, 2013).

[161] *See Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 882 n.3 (8th Cir. 2005) (noting that "'[t]he Act makes no exception for senders who mistakenly believe that the recipients' permission or invitation existed.' Intent is only relevant in determining whether treble damages should be awarded.") (internal citation omitted).

[162] SUMF, at ¶ 1.

conditions.[163]  Thus, even if the Court goes outside the boundaries of the motion to consider the damages issue, and decides not to follow the guidance of sister circuits in concluding that the TCPA imposes strict liability, it should still find that CBE's conduct was intentional, and award Plaintiff treble damages.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion should be granted.

Dated: August 20, 2017

Respectfully submitted,


*/s/ Miles N. Clark*
Matthew I. Knepper, Esq.
Miles N. Clark, Esq.
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Ste. 170-109
Las Vegas, NV 89129

David H. Krieger, Esq.
HAINES & KRIEGER, LLC
8985 S. Eastern Ave., Suite 350
Henderson, NV 89123

Attorneys for Plaintiff

---

[163] *Id.* at ¶ 4.

- 21 -

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2017, and pursuant to the Federal Rules of Civil Procedure, a true and correct copy of the foregoing **PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT** was served via the U.S. District Court's CM/ECF electronic filing system and via electronic mail to the following:

Eugene Xerxes Martin , IV, Esq. (Pro Hac Vice)
MALONE AKERLY MARTIN PLLC
8750 N Central Expressway, Ste 1850
Dallas, TX 75231
Email: xmartin@mamlaw.com

Robbie Malone (Pro Hac Vice)
MALONE AKERLY MARTIN PLLC
8750 N Central Expressway, Ste 1850
Dallas, TX 75231
Email: rmalone@mamlaw.com

Kurt R. Bonds, Esq.
ALVERSON TAYLOR MORTENSEN, ET AL
7401 W Charleston Blvd
Las Vegas, NV 89117-1401
Email: efile@alversontaylor.com

/s/ *Lucille Chiusano*
An employee of KNEPPER & CLARK LLC