# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| GRETTA MARSHALL, | ) |
| | ) |
| Plaintiff, | ) Case No.: 2:16-cv-02406-GMN-NJK |
| vs. | ) |
| | ) **ORDER** |
| THE CBE GROUP, INC., | ) |
| | ) |
| Defendant. | ) |

Pending before the Court is the Motion for Partial Summary Judgment, (ECF No. 33), filed by Plaintiff Gretta Marshall ("Plaintiff"). Defendant The CBE Group, Inc. ("CBE") filed a Response, (ECF No. 45), and Plaintiff filed a Reply, (ECF No. 55).

Also before the Court is CBE's Motion for Summary Judgment, (ECF No. 39). Plaintiff filed a Response, (ECF No. 54), and CBE filed a Reply, (ECF No. 56).

Also before the Court is CBE's Motion to Exclude the Supplemental Declaration and Testimony of Plaintiff's Expert Randall Snyder. (ECF No. 32). Plaintiff filed a Response, (ECF No. 48), and CBE filed a Reply, (ECF No. 53).[1]

For the reasons discussed herein, Plaintiff's Motion for Partial Summary Judgment, (ECF No. 33), is **DENIED**. CBE's Motion for Summary Judgment, (ECF No. 39), is **GRANTED in part** and **DENIED in part**. Further, CBE's Motion to Exclude and Strike, (ECF No. 32), is **DENIED**.

---

[1] Also before the Court are CBE's Motions for Leave to File Supplemental Authority, (ECF Nos. 41, 43), which are **GRANTED**.

## I. BACKGROUND

This case arises out of CBE's alleged violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (the "FDCPA"), and the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* (the "TCPA"), in their efforts to collect debts related to Plaintiff's unpaid DirecTV bill. On August 8, 2015, DirecTV placed a consumer debt account with CBE for collection. (CBE's Document Production ("CBE Records") at 1, Ex. 5 to Pl.'s Mot. for Partial Summ. J. ("Pl.'s MSJ"), ECF No. 33-7); (Johnson Dep. 66:21–67:10, Ex 4 to Pl.'s Resp. to CBE's MSJ ("Pl.'s Resp."), ECF No. 54-6). CBE began its debt-collection efforts the next day by mailing Plaintiff a demand letter for the debt. (CBE Records at 3). CBE subsequently obtained Plaintiff's cell phone number from a skip-tracing vendor in order to continue its debt collection. (Johnson Dep. 66:9–12).

CBE placed one hundred eighty-nine outbound calls to Plaintiff's cell phone, the majority of which took place between August of 2015 and January of 2016. (*Id.* 192:1–13); (CBE Records at 4–46). Plaintiff first asked CBE to stop calling her in August of 2015, when the calls began. (Marshall Dep. 23:16–23, 71:18–72:19, Ex. 6 to Pl.'s Resp., ECF No. 54-8). On August 18, 2015, Plaintiff placed an inbound call to CBE in which she expressed her desire that the calls cease. (Johnson Dep. 143:14–144:3). On September 8, 2015, Plaintiff and a CBE agent engaged in a heated conversation in which Plaintiff expressed her frustration with the calls. (*Id.* 144:9–146:19). According to CBE, Plaintiff "never requested to be placed on the internal do not call list, and appeared to take it upon herself to stop the calls." (CBE's MSJ ¶ 3) (citing Business Rs. Aff. at 3, Ex. 1 to CBE's MSJ, ECF No. 39-1).

Between September 18, 2015, and September 22, 2015, CBE placed ten calls to Plaintiff's place of employment. (Johnson Dep. 147:2–19). CBE placed its final call to Plaintiff on February 11, 2016. (CBE Records at 46). On March 14, 2016, DirecTV recalled its account with CBE. (Johnson Dep. 103:5–104:5).

On October 16, 2016, Plaintiff filed her Complaint, (ECF No. 1), asserting the following violations arising from CBE's debt-collection activity: (1) the TCPA; (2) the FDCPA; and (3) the Nevada Deceptive Trade Practices Act, Nevada Revised Statute ("NRS") § 598 ("NDTPA"). (*See* Compl. ¶¶ 58–87).

## II. **DISCOVERY MOTIONS**

CBE moves the Court to exclude Plaintiff's expert Randall Snyder's ("Snyder") Supplemental Declaration and to strike Snyder as a designated expert in this case. (*See generally* Mot. to Strike, ECF No. 32). CBE argues that the Supplemental Declaration is untimely and otherwise improper because it includes a new conclusion in violation of Federal Rule of Civil Procedure 26(e)(2). (*Id.* ¶¶ 4–7). CBE seeks to strike Snyder as a designated expert on the basis that Snyder is unqualified to testify in this case, his opinions are unreliable, and he impermissibly incorporates legal conclusions in his analysis. (*Id.* ¶¶ 13–34).

Plaintiff responds that CBE's Motion is improper because CBE failed to comply with the meet-and-confer requirements under Local Rule 26-7. (Pl.'s Resp. to Mot. to Strike 5:15–17, ECF No. 48). Plaintiff also argues that Snyder is qualified to render expert opinions, and that the Supplemental Declaration was timely and required as a supplemental disclosure pursuant to Rule 26(a)(3). (*Id.* 7:4–20, 9:10–17:24).

### A. Local Rule 26-7

Courts in this District have held that "parties with discovery disputes are required to conduct personal, two-way communication to attempt to resolve their disputes without judicial intervention." *Picozzi v. Clark Cnty. Detention Ctr.*, No. 2:15-cv-00816-JCM-PAL, 2016 WL 6518627, at *2 (D. Nev. Nov. 2, 2016) (citing *ShuffleMaster, Inc. v. Progressive Games, Inc.*, 170 F.R.D. 166, 171 (D. Nev. 1996)). Under Local Rule 26-7, discovery motions will not be considered unless the movant (1) makes a good-faith effort to meet and confer; and (2) includes a declaration setting forth the details and results of the meet-and-confer conference about each

disputed discovery request. D. Nev. LR 26-7(c).  Pursuant to the local rules, "meet and confer" means "to communicate directly and discuss in good faith the issues required under the particular rule or court order." D. Nev. LR IA 1-3(f).  Unless otherwise provided, "this requirement may only be satisfied through direct dialogue" and the "exchange of written, electronic, or voice-mail communications does not satisfy this requirement." *Id.*  To ensure compliance, movants must file certifications that "accurately and specifically convey to the court who, where, how, and when the respective parties attempted to personally resolve the discovery dispute." *Picozzi*, 2016 WL 6518627, at *2 (citing *Nevada Power v. Monsanto*, 151 F.R.D. 118, 120 (D. Nev. 1993)).

        The Court is not satisfied that CBE made a good-faith effort to meet and confer prior to filing its Motion to Exclude and Strike.  The Court agrees with Plaintiff that "despite having direct knowledge of Mr. Snyder's supplemental declaration for approximately a month, [CBE] made no effort to meet and confer until August 18, 2017—the day it filed its motion to exclude." (*Id.* 6:6–10).  On that day, CBE left voicemails and sent an email to Plaintiff's counsel, to which Plaintiff failed to respond.  This does not comply with the local rules. *See* D. Nev. LR IA 1-3(f); *see also Whitlock v. City of Caliente*, 2014 WL 4929509, at *1 (D. Nev. Oct. 1, 2014) ("Plaintiff[] . . . left a voicemail with Defense counsel stating the motion to compel would be filed if responses were not received by the end of the day. This is insufficient.").  Further, the Court agrees with Plaintiff that CBE failed to support its Motion with a "properly detailed declaration," and instead attached a "three-line unsworn statement" summarizing the meet and confer efforts. (Pl.'s Resp. to CBE's Mot. to Strike 6:14–19); (*see* Mot. to Strike at 17); *see also* D. Nev. LR 26-7(c); *Kondrk v. Towbin Dodge LLC*, No. 2:15-cv-003300-RFB-NJK, 2015 WL 12976099, at *1 (D. Nev. Nov. 9, 2015) ("[I]t does not appear from the declaration that Defendant's attorney has spoken with [plaintiff's] attorney regarding the instant dispute.  Absent such personal consultation, the meet-and-confer is insufficient.").

CBE nonetheless urges the Court to use its discretion and consider its Motion despite noncompliance with the local rules. (Reply to Pl.'s Resp. to CBE's Mot. to Strike, 2:23–3:8, ECF No. 53). CBE asserts that a meet-and-confer would have been futile because Plaintiff would be unlikely to agree to strike its own expert witness. (*Id.* 3:11–12). The Court, however, agrees with Plaintiff that CBE failed to avail itself of alternative remedies such as a stipulation or motion to extend the applicable expert rebuttal deadlines. (Pl.'s Resp. to Mot. to Strike 8:13–9:2). Thus, the Court finds that CBE's attempt to meet-and-confer falls short of the good-faith standard contemplated by this District's local rules. Accordingly, CBE's Motion to Exclude and Strike is denied.[2]

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

---

[2] Nonetheless, as discussed *infra*, the Court will disregard Snyder's expert opinions to the extent they improperly incorporate legal conclusions or otherwise lack adequate factual foundation.

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### B. Discussion

Plaintiff and CBE seek summary judgment on Plaintiff's claim under the TCPA. (*See* Pl.'s MSJ, ECF No. 33); (CBE's MSJ ¶¶ 17–23, ECF No. 39). CBE also moves for summary judgment on Plaintiff's claims under the FDCPA and the NDTPA. (CBE's MSJ ¶¶ 24–36). The Court will address the merits of Plaintiff's claims in turn.

#### a. Telephone Consumer Protection Act

Plaintiff argues CBE violated the TCPA because CBE agents called Plaintiff using an automatic telephone dialing system ("ATDS"), which is unlawful under the TCPA. (Pl.'s MSJ 14:9–11). CBE asserts that its communications infrastructure does not constitute an ATDS and, therefore, CBE is entitled to judgment as a matter of law. (CBE's MSJ ¶ 17).

Under the TCPA, it is unlawful "to make any call . . . using any automatic telephone dialing system . . . to any . . . cellular telephone service," without the prior consent of the called party. *Kristensen v. Credit Payment Servs., Inc.*, 879 F.3d 1010, 1013 (9th Cir. 2018) (quoting 47 U.S.C. § 227(b)(1)(A)(iii)). An ATDS "means equipment which has the capacity (a) to store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers." 47 U.S.C. § 227(a)(1).

In a 2015, the Federal Communications Commission ("FCC") issued an order (the "2015 FCC Order") noting that whether a system has the capacity to operate as an ATDS is not limited to a system's "present use," but may include a system's "potential functionalities." *See In the Matter of Rules and Regulations Implementing the Tel. Consumer. Prot. Act of 1991*, 30

F.C.C.R. 7961, 7974 (2015). The FCC reiterated, based on a prior order (the "2003 FCC Order), that the "basic function" of an ATDS is the "capacity to dial numbers without human intervention." *Id.* 7975; *see also* 2003 FCC Order, 18 F.C.C.R. 14014, 14029 (2003) ("The basic function of such equipment, however, has not changed—the *capacity* to dial numbers without human intervention."). The 2015 FCC Order also noted that an ATDS encompasses "predictive dialers," because this kind of "hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or form a database of numbers." *Id.*

On March 16, 2018, the United States Court of Appeals for the District of Columbia Circuit concluded that the FCC's definition of an ATDS constituted an "unreasonably expansive interpretation of the statute." *See ACA Int'l v. FCC*, No. 15-1211, 2018 WL 1352922, at *1 (D.C.C. Mar. 16, 2018).[3] The Court explicitly set aside the 2015 FCC Order's interpretation of an ATDS and stated the following:

> So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity? The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers). It might be permissible for the [FCC] to adopt either interpretation. But the [FCC] cannot, consistent with reasoned decisionmaking, espouse both interpretations in the same order.

*Id.* at *12.

In light of this ruling,[4] the Court will not stray from the statute's language which "mandates that the focus be on whether the equipment has the "*capacity* 'to store or produce

---

[3] Following this ruling, the Court ordered the parties to file supplemental briefs addressing the impact of *ACA Int'l* on Plaintiff's TCPA claim. (*See* Minute Order, ECF No. 57). CBE and Plaintiff filed their respective briefs, (*see* ECF Nos. 58, 59), and the Court has considered both of them in the instant Order.

[4] The Court rejects Plaintiff's argument that *ACA Int'l* does not bind this Court. (*See* Pl.'s Suppl. Br. 9:19–10:5, ECF No. 59). The D.C. Circuit's decision is binding on this Court because appellate courts have exclusive jurisdiction to determine the validity of all FCC final orders and the Judicial Panel on Multidistrict Litigation has consolidated the various appeals in that case in the D.C. Circuit. *See* 28 U.S.C. § 2342(1); *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1987); *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir.

telephone numbers to be called, using a random or sequential number generator.'" *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (quoting 47 U.S.C. § 227(a)(1) (emphasis in original)).

CBE places calls by using a Manual Clicker Application ("MCA"), which is web-based software by which a CBE agent clicks a bull's-eye on a computer screen and a call is placed. (Johnson Dep. 37:8–21, Ex. 4 to Pl.'s Resp., ECF No. 54-6). The MCA works in conjunction with LiveVox, a cloud-based connectivity pass-through. (Snyder Suppl. Decl. ¶¶ 70–71, Ex. 1 to Pl.'s MSJ, ECF No. 33-3). Once a CBE agent clicks the bull's-eye, a call is passed through LiveVox's cloud connecting a CBE agent with the person to whom the call is placed. (Johnson Dep. 50:1–14); (Stark Dep. 11:23–25, ECF No. 35-1).

The parties characterize the interplay between the MCA and LiveVox differently and, accordingly, dispute whether an ATDS was used. CBE primarily relies upon the opinions of Terry Johnson, Enterprise Architect for CBE, and Kevin Stark, the Director of Product Management for LiveVox. (CBE's Resp. to Pl.'s MSJ ("CBE's Resp."), 8:23–26, ECF No. 45); (*see also* CBE's Reply to Pl.'s Resp. ("CBE's Reply") 8:1–3, ECF No. 56). According to Johnson, once a CBE agent "initiate[s] the calls, the calls are immediately dialed. There is no delay or queuing or listing or batching." (Johnson Dep. 48:17–19, Ex. C to CBE's Resp., ECF No. 45-4). Johnson further asserts "the dialing of calls is entirely controlled manually by the MCA. The MCA then uses a LiveVox system to connect to a public switched telephone network." (Johnson Dep. 196:2–197:5); (Johnson Aff. ¶ 3, Ex. A to CBE's Resp., ECF No 45-2). Stark states that the LiveVox system in this case "does not feature telephone call initiation functionality," and that LiveVox does not "initiate any of the calls made by CBE using the MCA and the Technology." (Stark Aff. ¶ 9, Ex. B to CBE's Resp., ECF No. 45-3). Stark

---

2008); *Cabiness v. Educ. Fin. Sols., LLC*, No. 16-CV-01109-JST, 2017 WL 167678, at *3 n.1 (N.D. Cal. Jan. 17, 2017).

acknowledges that, while LiveVox does produce dialing systems that could constitute an ATDS, the specific LiveVox system used in the instant case was designed to only launch calls through manual dial requests and is without the potential to autodial. (*Id.* ¶¶ 9–17); (*see also* Stark Dep. 11:15–17, ECF No. 35-1).

Plaintiff characterizes the MCA as "provid[ing] numbers for automatic dialing by a third party, LiveVox." (Pl.'s MSJ 6:5–6). Plaintiff relies on the expert opinion of Randall Snyder, whose conclusions have been called into question by CBE. (*See generally* Mot. to Strike). Snyder asserts that the "MCA is really designed to perform the function of providing telephone numbers to a dialing system, one at a time by clicking an icon (i.e., the bulls-eye)." (Snyder Suppl. Decl. ¶ 98). Therefore, "[t]he clicker agent who is clicking the bulls-eye on the MCA is not performing any type of dialing process; rather, the clicker agent is simply causing a telephone number to be supplied to the LiveVox system to be automatically dialed by that system." (*Id.* ¶ 119).

The parties do not appear to dispute that the MCA, by itself, does not qualify as an ATDS. (Snyder Dep. 100:24–101:4, Ex. E to CBE's Resp., ECF No. 45-5); (Johnson Aff. ¶ 4). The dispute is whether the MCA, in conjunction with the LiveVox system, constitutes an ATDS. (Pls.'s MSJ 16:22–17:4).

As to the LiveVox system in this case, Plaintiff has failed to establish a genuine issue of material fact as to whether LiveVox has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator. While Snyder comes to the ultimate legal conclusion that LiveVox has the "capacity to store or produce telephone numbers to be called, using a random or sequential generator," his premises do not support this contention. (Snyder Suppl. Decl. ¶ 129).[5] Specifically, Snyder bases his conclusion on the fact that

---

[5] To the extent Plaintiff's arguments rely upon Snyder's recitation of the definition of an ATDS, the Court will disregard them. *See Tyus v. Wendy's of Las Vegas, Inc.*, No. 2:14-cv-00729-GMN-VCF, 2017 WL 3026403, at *7 (D. Nev. July 17, 2017) ("To the extent the [expert] declaration improperly draws legal conclusions, in

Page 10 of 19

LiveVox maintains call log records which include timestamps for outgoing calls and contain "CallType" and "Call_Result" fields. (Snyder Suppl. Decl. ¶¶ 89–92); (*See* Pl.'s MSJ 10:9–10) ("Evidence on the face of call log records produced in this case also demonstrate that it is LiveVox who initiates the call."). According to Snyder, LiveVox's ability to perform call progress analysis "implies that CBE is not initiating the call but LiveVox is." (Snyder Suppl. Decl. ¶ 93).

The Court agrees with CBE that there is no evidence, or legal authority, suggesting that LiveVox's ability to track calling information means that the system has the capacity to store or produce numbers to be called using a random or sequential number generator. (CBE's Resp. 13:9–13); *see also Biel v. Bloomingdale's, Inc.*, No. 8:15-cv-01810-JLS-DFM, 2016 WL 7655742, at *3 (C.D. Cal. June 23, 2016) ("[T]he proffered call log fails to provide any evidence that Defendant's system 'has the *capacity to randomly or sequentially* generate telephone numbers to be stored, produced, or called' . . . .") (emphasis in original).

Snyder also concludes that the LiveVox system is an ATDS because it operates as a predictive dialer, a function which the FCC concluded in the 2015 FCC Order, as well as in previous orders, could render a system an ATDS. (Pl.'s Resp. 19:15–18, ECF No. 54). In those rulings, the FCC found that an ATDS could include technology that dials from "a fixed set of numbers," rather than only systems that have the capacity to dial randomly or sequentially.[6] *See*

---

deciding the Defendant's Renewed Motion for Summary Judgment, the District Court may disregard them."); *see also Heidig v. PNC Mortg., a Div. of PNC Bank, N.A.*, No. 3:16-cv-00576-MMD-VPC, 2017 WL 6447869, at *2 (D. Nev. Dec. 18, 2017) ("[T]he Court cannot consider the expert declaration insofar as it makes legal conclusions."). As another court has recognized, specifically with regard to the testimony of Randall Snyder, "implicit within this testimony is Snyder's conclusion as to the legal definition of an [ATDS]." *See Legg v. Voice Media Grp., Inc.*, No. 13-62044-CIV, 2014 WL 1767097, at *4 (S.D. Fla. May, 2 2014) (excluding Snyder's "proposed testimony that VMG used an [ATDS] within the meaning of the TCPA.").

[6] Presumably, this explains why Snyder's legal conclusions as to the definition of an ATDS repeatedly invoke the disjunctive phrase "or from a list or database of numbers," which does not appear in the statute. (*See* Snyder Suppl. Decl. ¶ 129) ("[T]he LiveVox system . . . has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, *or from a list or database of numbers*, and to dial such numbers without human intervention.") (emphasis added) (*see also id.* ¶ 96); (*Id.* ¶ 9).

2015 FCC Order, 30 F.C.C.R. at 7973; *see also* 2003 FCC Order, 18 F.C.C.R. at 14092–93. As discussed *supra*, the D.C. Circuit explicitly rejected this "expansive" interpretation of the TCPA, particularly as that definition pertained to systems that may not, in fact, have the capacity to dial randomly or sequentially. *See ACA Int'l*, 2018 WL 1352922, at *11–12. Accordingly, Plaintiff cannot rely on the FCC's definition of an ATDS to the extent it includes systems that cannot be programmed to dial random or sequential numbers, as is the case with some predictive dialers. *Id.* at *11.

Plaintiff argues that notwithstanding the *ACA Int'l* ruling, the 2015 FCC Order, as well as the 2003 FCC Order, remains binding on this Court. (*See* Pl.'s Suppl. Br. 9:20–21, ECF No. 59). Even assuming, *arguendo*, that Plaintiff is correct, these interpretations have repeatedly emphasized the significance of the "human intervention" element to the ATDS analysis. *See* 2015 FCC Order, 30 F.C.C.R. 7961, 7974; 2003 FCC Order, 18 F.C.C.R. 14014, 14029. The Court notes that that the overwhelming weight of authority applying this element hold that "point-and-click" dialing systems, paired with a cloud-based pass-through services, do not constitute an ATDS as a matter of law in light of the clicker agent's human intervention. *See, e.g.*, *Strauss v. The CBE Grp., Inc.*, 173 F. Supp. 3d 1302, 1310–11 (S.D. Fla. 2016) (granting summary judgment because "CBE has presented substantial evidence that human intervention is essential at the point and time that the number is dialed using the MCA and that the Noble equipment used does not have the functionalities required to classify it as a predictive dialer . . . ."); *Pozo v. Stellar Recovery Collection Agency, Inc.*, No. 8:15-cv-929-T-AEP, 2016 WL 7851415, at *4 (M.D. Fla. Sept. 2, 2016); ("As in *Strauss*, Stellar's clicker agents initiate all calls by clicking a dialogue box . . . . Most importantly, [LiveVox HCI] does not allow any calls to be made without a Stellar agent clicking the dialogue box to initiate the call."); *Smith v. Stellar Recovery, Inc.*, No. 2:15-cv-11717, 2017 WL 955128, at *3 (E.D. Mich. Mar. 13, 2017); ("[T]he HCI system is characterized by one key factor that separates it from autodialers; it

requires human intervention—the clicker agent—to launch an outgoing call. Since the 'basic function' of an autodialer is the capacity to dial phone numbers 'without human intervention,' and the HCI system lacks that capacity, the HCI is not an autodialer."); *Arora v. Transworld Sys., Inc.*, No. 15-cv-4941, 2017 WL 3620742, at *1, *3 (E.D. Ill. Aug. 23, 2017); ("Each call initiated from a Human Call Initiator must be initiated by a human 'clicker agent.' . . . Because all calls from TSI were made with human intervention, and not with an ATDS, Arora's TCPA claim fails as a matter of law."). Here, as in those cases, it is undisputed that human intervention, by virtue of CBE's "clicker agents," is integral to *initiating* outbound calls. (*See* Snyder Suppl. Decl. ¶ 98); (Johnson Dep. 37:8–21). Therefore, to the extent the FCC's previous orders remain intact, the human intervention element weighs in favor of a finding that the MCA, in conjunction with LiveVox, is not an ATDS.

The Court further notes that Snyder never inspected the LiveVox system at issue in this case. (Snyder Dep. 75:14–19); (Johnson Aff. ¶ 7). Courts have declined to allow expert testimony to create a disputed issue of material fact in TCPA cases where the expert in question has not examined the dialing infrastructure at issue. *See, e.g.*, *Pozo*, 2016 WL 7851415, at *5 ("Again, LiveVox offers multiple telephone dialing systems. There is no indication that Parker actually examined the HCI system."). As was the case in *Pozo*, LiveVox provides "several and distinct outbound dialing systems," each with different functionalities, some of which may implicate the TCPA, while other systems are designed specifically "to enable only manual calls." (*See* Stark Aff. ¶¶ 4–7); (Stark Dep. 11:15–17, ECF No. 35-1). Despite having never reviewed the LiveVox system used in this case, Snyder testified that the system constitutes an ATDS while simultaneously acknowledging that he did not know what dialing system LiveVox uses. (Snyder Dep. 114:8–20). The fact that Snyder has "analyzed the LiveVox automatic dialing system in several TCPA cases" does not substitute for his unfamiliarity with LiveVox's system used in this case. (Snyder Suppl. Decl. ¶ 73); (Snyder Dep. 72:11–18, 113:5–12).

Based on the foregoing, the Court is unpersuaded that Plaintiff can rely on Snyder's conclusions to establish a genuine issue of material fact that the LiveVox system used in this case has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. Moreover, CBE has introduced competent evidence demonstrating that the MCA is initiating the calls and that the LiveVox system used in this case does not have the capacity to operate as an ATDS. (*See, e.g.*, Johnson Dep. 196:2–197:5); (Stark Aff. ¶ 9). Accordingly, Plaintiff's Motion for Partial Summary Judgment, (ECF No. 33), is denied. CBE's Motion for Summary Judgment, (ECF No. 39), on Plaintiff's TCPA claim, is granted.

### b. Fair Debt Collection Practices Act

CBE moves for summary judgment on Plaintiff's FDCPA claims pursuant to 15 U.S.C. § 1692d on the basis that there is "no evidence that [CBE] engaged in any activity that was intended to harass, oppress, or abuse Plaintiff." (CBE's MSJ ¶ 31). CBE also seeks summary judgment on Plaintiff's FDCPA claim under § 1692f because that claim is impermissibly based on the same underlying conduct as Plaintiff's § 1692d claim. (*Id.* ¶ 34). Plaintiff responds that her factual allegations are sufficient to create a triable issue as to "whether CBE's conduct rises to the level of being harassing." (Pl.'s Resp. 28:8–14).

#### 1. 15 U.S.C. § 1692d

Section 1692d of the FDCPA provides, "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. "An act's 'natural consequences' are evaluated according to their likely effect on the least sophisticated consumer." *Kerwin v. Remittance Assistance Corp.*, 559 F. Supp. 2d 1117, 1124 (D. Nev. 2008) (citing *Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 778 (9th Cir. 1982)). This section's prohibitions include, *inter alia*, "[c]ausing a telephone to ring or engaging a person in a telephone conversation repeatedly or

continuously with the intent to annoy, abuse, or harass any person at the called number." 15 U.S.C. § 1692d(5).

A debt collector's intent to annoy, abuse, or harass "may be inferred from the frequency of phone calls, the substance of the phone calls, or the place to which the phone calls are made. *Enriquez v. Red Rock Fin. Servs., LLC*, No. 2:14-cv-02118-GMN-CWH, 2015 WL 1186570, at *3 (D. Nev. Mar. 15, 2015) (quoting *Kerwin*, 559 F. Supp. 2d at 1124). "Some examples of harassing behavior include 'immediately recalling the debtor after [she] hung up the telephone,' 'continuing to call the debtor after [she] requested that the debt collector cease and desist communication,' calling the debtor at her workplace . . . or calling several times in the same day or multiple times over a short span of time." *McGowan v. Credit Mgmt. LP*, 2015 WL 5682736, No. 2:14-cv-00759-APG-VCF, at *4 (D. Nev. Sept. 24, 2015) (quoting *Arteaga v. Asset Acceptance, LLC*, 733 F. Supp. 2d 1218, 1227–28 (E.D. Cal. Aug. 23, 2010)). However, there is no bright-line rule concerning the amount or pattern of calls sufficient to raise a triable issue of fact regarding the intent to annoy, harass, or oppress. *See id.* (citing *Arteaga*, 733 F. Supp. 2d at 1227). Rather, "[w]hether conduct is annoying, abusive, or harassing generally is a fact question for the jury." *Id.*

Here, viewing the facts in a light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that CBE placed the calls with an intent to annoy, abuse, or harass. CBE placed one hundred eighty-nine calls between August of 2015, and February of 2016. (Johnson Dep. 190:18–192:13); (CBE Records at 27–46). Plaintiff testified that she had received more than two calls in one day during this period. (Marshall Dep. 25:11–13). According to Plaintiff, she requested that the calls cease in August of 2015, and again on September 8, 2015. (*Id.* 16:9–1); (Johnson Dep. 144:9–146:19). Plaintiff placed an inbound call to CBE expressing her desire that the calls stop on August 18, 2015. (Johnson Dep. 143:14–144:3). In addition, CBE placed ten calls to Plaintiff's place of employment between

September 18, 2015, and September 22, 2015. (*Id.* 147:2–19). Plaintiff further testified that CBE agents "never actually clarified why they were calling." (Marshall Dep. 27:7–13). Based on these facts, the Court finds there is a genuine issue of material fact as to whether CBE's conduct violated the FDCPA. Accordingly, the Court denies CBE's Motion for Summary Judgment on Plaintiff's § 1692d claim.

### *2. 15 U.S.C. § 1692f*

CBE argues that Plaintiff's FDCPA claim pursuant to § 1692f fails as a matter of law because it is based on the same conduct as her § 1692d claim. (CBE's MSJ ¶ 34). CBE further argues there is no evidence to support any unfair or unconscionable act on the part of CBE. (*Id.* ¶ 35).

"Section 1692f prohibits a debt collector from using 'unfair or unconscionable means to collect or attempt to collect any debt.'" *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 130 (9th Cir. 2010) (quoting 15 U.S.C. § 1692f). Section 1692f provides a non-exhaustive list of conduct that constitutes unfair or unconscionable acts. *See* 15 U.S.C § 1692f. While the District of Nevada has not addressed the precise issue, courts in this Circuit have recognized that a cause of action is deficient under § 1692f "if it does not identify any misconduct beyond which plaintiffs assert violate other provisions of the FDCPA." *Thomas v. Loomis-Therrien*, No. 5:14-cv-00979-CAS-JC, 2014 WL 5335913, at *6 (C.D. Cal. Oct. 20, 2014) (citation omitted); *Amina v. WMC Mortg. Corp.*, No. 10-cv-00165-JMS-KSC, 2011 WL 1869835, at *16 (D. Haw. May 16, 2011) ("[A] plaintiff must base violations of §§ 1692e & 1692f on conduct other than that already identified in other sections of the FDCPA."); *Masuda v. Thomas Richard & Co.*, 759 F. Supp. 1456, 1461 n.10 (C.D. Cal. 1991) ("Congress employed general language to 'enable the courts, where appropriate, to proscribe . . . improper conduct which is not specifically addressed.") (citation omitted).

Courts in other Circuits have recognized a "growing consensus . . . that a claim under § 1692f must be based on conduct either within the listed provisions, or be based on conduct which falls outside of those provisions, but which does not violate another provision of the FDCPA." *Osborn v. Ekpsz, LLC*, 821 F. Supp. 2d 859, 878 (S.D. Tex. 2011) ("Section 1692 serves a backstop function, catching those 'unfair practices' which somehow manage to slip by §§ 1692d & 1692e."); *see also Vanhuss v. Kohn Law Firm S.C.*, 127 F. Supp. 3d 980, 990–91 (W.D. Wis. Sept. 1, 2015); *Strouse v. Enhanced Recovery Co.*, 956 F. Supp. 2d 627, 637 (E.D. Pa. 2013); *Stewart v. Bierman*, 859 F. Supp. 2d 754, 765 (D. Md. 2012); *Foti v. NCO Fin. Sys., Inc.*, 424 F. Supp. 2d 643, 667 (S.D.N.Y. 2006).

Here, Plaintiff concedes that her allegation pursuant to § 1692f is based on the same conduct as her claim under § 1692d. (*See* Pl.'s Resp. 28:16–17) ("For the same reasons as provided in connection with Plaintiff's Section 1692d claim, her Section 1962f claim should reach a jury."); (*see also* Pl.'s Compl. ¶ 62) ("[CBE's] conduct violated 15 U.S.C. § 1692f in that [CBE] use unfair and unconscionable means to collect a debt and attempted to humiliate and belittle Plaintiff."). Because Plaintiff does not allege, or argue, any § 1692f violation that is independent of Plaintiff's § 1692d claim, this cause of action fails as a matter of law. CBE is entitled to summary judgment on Plaintiff's § 1692f claim.

**c. Nevada Deceptive Trade Practices Act**

CBE moves for summary judgment on Plaintiff's NDTPA claim on the basis that the NDTPA does not apply to debt-collection activities. (CBE's MSJ ¶ 36). Plaintiff responds by arguing that the "law is unclear" in this regard and CBE placed no facts before the Court to shift the burden with regard to its Motion. (Pl.'s Resp. 30:14–15).

Under NRS § 598.0918, "a person engages in a 'deceptive trade practice' if, during a solicitation by telephone or sales representative, he or she . . . [r]epeatedly or continuously

conducts the solicitation or presentation in a manner that is considered by a reasonable person to be annoying, abusive, or harassing . . . ." NRS § 598.0918(2).

CBE cites to authority from this District for the proposition that the NDTPA does not apply to debt collection. (CBE MSJ ¶ 36) (citing *Gage v. Cox Commc'ns, Inc.*, No. 2:16-cv-02708-KJD-GWF, 2017 WL 1536219, at *2 (D. Nev. Apr. 27, 2017)). In *Gage*, the court concluded that the plaintiff failed to state a cause of action under NRS § 598.0918 because the phone calls in question were in regards to debt collection. 2017 WL 1536219, at *2. Judge Dawson noted that "this Court has previously held that the entirety of Section § 598 only applies to transactions involving goods and services." *Id.* Judge Dawson further reasoned that "N.R.S. § 80.015(1)(h) states that the act of 'securing or collecting debts' does not constitute doing business in Nevada and is therefore not applicable to the NDTPA." *Id.*; *see also Peatrowsky v. Persolve*, No. 2:12-cv-00935-JAD-VCF, 2014 WL 1215061, at *5 (D. Nev. Mar. 24, 2014) ("[A]s 'securing or collecting debts' does not constitute doing business in Nevada, [the defendant's] actions were not 'in the course of . . . business" as required by the NDTPA.").

Plaintiff counters that "[m]ore recent authority in Nevada interpreting NRS 598's plain language acknowledges that these provisions 'often' refer to 'goods and services,' and can be fairly read to encompass, *inter alia*, 'lending practices.'" (Pl.'s Resp. 29:15–17). The cases Plaintiff cites, however, do not support the proposition that the NDTPA may apply to debt collection. In *Caudros*, for example, the court applied the NDTPA to the defendant insurance company's alleged misrepresentations "in the course of settling an insurance claim." *See Cuadros v. State Farm Fire and Cas, Co.*, 2017 WL 2683681, at *5 (D. Nev. June 20, 2017). Plaintiff also cites *Morris*, in which this Court concluded that because the plaintiff's claims pertained to "real property," they are "not subject to the [NDTPA]." *See Morris v. Green Tree Servicing, LLC*, No. 2:14-cv-01998-GMN-CWH, 2015 WL 4113212, at *15 (D. Nev. July 8, 2015). While this Court used the phrase "*transactions* of goods and services," it did so only to

clarify that the NDTPA does not apply to real estate transactions. *See id.* ("Courts in this jurisdiction have routinely held that the [NDTPA] does not apply to mortgage transactions and real estate, but *only to transactions of goods and services*.") (emphasis added).

The Court agrees with the courts in this District that hold that debt collection does not fall within the ambit of the NDTPA. *See Gage*, 2017 WL 1536219, at *2; *see also Peatrowsky*, 2014 WL 1215061, at *5. In the absence of any authority to the contrary, the Court concludes that the NDTPA does not apply to debt collection. Accordingly, Plaintiff's NDTPA claim fails as a matter of law and CBE is entitled to summary judgment on this claim.

## IV.   CONCLUSION

**IT IS HEREBY ORDERED** that CBE's Motion to Exclude and Strike, (ECF No. 32), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment, (ECF No. 33), is **DENIED**.

**IT IS FURTHER ORDERED** that CBE's Motion for Summary Judgment, (ECF No. 39), is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that CBE's Motion for Summary Judgment as to Plaintiff's claims pursuant to the TCPA, § 1692f of the FDCPA, and NDTPA is **GRANTED**.

**IT IS FURTHER ORDERED** that CBE's Motion for Summary Judgment as to Plaintiff's claim under § 1692d of the FDCPA is **DENIED**.

**IT IS FURTHER ORDERED** that CBE's Motions for Leave to File Supplemental Authority, (ECF Nos. 41, 43), are **GRANTED**.

**DATED** this __30__ day of March, 2018.

_____
Gloria M. Navarro, Chief Judge
United States District Judge